## COUNTY COUNCIL FOR PRINCE GEORGE'S COUNTY, MARYLAND ET AL. *v.* POTOMAC ELECTRIC POWER COMPANY

[No. 49, September Term, 1971.]

*Decided October 15, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Glenn B. Harten*, Associate County Attorney, with whom was *Walter H. Maloney, Jr.*, County Attorney, on the brief, for appellant Prince George's County, Maryland. *Samuel F. Ianni* for appellant Ianni.

*Russell W. Shipley*, with whom were *Kahler, Shipley & O'Malley* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The question presented to us in this appeal is whether the judgment of the Circuit Court for Prince George's County (Loveless, J.) dated February 24, 1971, was erroneous in reversing the action of the Board of County Commissioners for Prince George's County, sitting as a District Council (District Council), in failing to grant to the Potomac Electric Power Company (Pepco) a special exception under the zoning ordinance of Prince George's County for the purpose of erecting and maintaining an electric substation on a 29.275 acre tract of land in College Park in Prince George's County adjacent to the present power lines of Pepco.

Section 28.330 of the applicable zoning ordinance provides that the applicant for the special exception for the erection and maintenance of the electric substation must show:

"a. The proposed use at the location selected is necessary for public convenience and service and cannot be supplied with equal public convenience, if located elsewhere.

"b. The proposed use at the location selected will not endanger the health and safety of workers and/or residents in the community and will not impair or prove detrimental to neighboring properties or the development of same."

The Circuit Court for Prince George's County, as the reviewing court on appeal from a decision of the District Council, is given the power by § 59-85 (i) of the Code of Public Local Laws of Prince George's County (1963 ed., Supp. 1967), as amended, to reverse or modify such decision if substantial rights of the petitioner on appeal may have been prejudiced because the findings, inferences, conclusions or decisions are "* * * (5) *unsupported by competent, material and substantial evidence in view of the entire record as submitted, or (6) arbitrary or capricious.*" (Emphasis supplied.)

In *Rockville Fuel & Feed Co., Inc. v. Board of Appeals of the City of Gaithersburg*, 257 Md. 183, 262 A. 2d 499 (1970), we held that the findings of the zoning board were unsupported by any probative evidence. Chief Judge Hammond aptly stated for the Court:

"If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But, if there is no probative evidence at all of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception is arbitrary, capricious and illegal."

(257 Md. at 191, 262 A. 2d at 504.)

We cited *Rockville Fuel & Feed Co.* with approval in the recent case of *Cason v. Board of County Commissioners for Prince George's County*, 261 Md. 699, 707, 276 A. 2d 661, 665 (1971).

See also *Montgomery County Council v. Scrimgeour*, 211 Md. 306, 127 A. 2d 528 (1956) ; *Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 96 A. 2d 261 (1953).

The present appeal comes to us in the unusual posture of a reversal of the failure of the District Council to grant the requested special exception because of a tie vote in the District Council. One Commissioner abstained; Chairman Aluisi and Commissioner Baggett voted in favor of granting the special exception and Commissioners Francois and Spellman voted to deny it. Hence, the granting of the application for the special exception failed for want of a majority vote. The four Commissioners who voted gave statements concerning their respective votes.

Judge Loveless, on appeal to the Circuit Court, found that Pepco had established the need for the electric substation; that the criteria for the requested special exception had been clearly established by it; and that, in effect, there was no competent, material or substantial evidence to support a contention to the contrary. Accordingly, as we have indicated, he directed that the application for the special exception be granted.

We have concluded that the lower court was correct in its conclusion and will affirm the judgment.

The appellants strenuously contend that there was sufficient evidence to make the issues before the District Council fairly debatable and hence, in accordance with our many prior decisions, the courts should not substitute their judgment for that of the District Council. *Smith v. Board of County Commissioners of Howard County*, 252 Md. 280, 249 A. 2d 708 (1969) and cases therein cited.

If there were such sufficient evidence, the contention of the appellants would be correct; but, as we have seen, when there is no sufficient probative evidence, so that the issues are not fairly debatable, the action of the District Council is arbitrary and capricious and hence a denial of due process of law. In the instant case, apart from the constitutional issue, the statute itself, as we

have observed, gives the Circuit Court upon appeal power to reverse the District Council if its findings are not supported by competent, material and substantial evidence in view of the whole record as submitted or if its findings are arbitrary or capricious.

Inasmuch as the resolution of the issue in this appeal turns on a consideration of the facts presented to the District Council, we will consider those facts in some detail.

Pepco is a public utility corporation furnishing electric power to the residents of the Washington Metropolitan area which includes Prince George's County. This county has had a rapid increase in population during the past decade with a consequent rapid increase in the demand for electric power from Pepco. In the past six years, in the general area, Pepco's customers have increased by 53% and the use of electrical energy has increased by 169%. To meet these ever-increasing needs, Pepco conducted studies to determine where a new substation should be located. Several possible sites were considered but were rejected for reasons later stated in this opinion. Pepco's officials concluded that the 29.275 acre tract adjacent to Pepco's present power lines in College Park was the only suitable location meeting all of the requirements of the much needed facility. Accordingly, Pepco, as contract purchaser, and the University of Maryland, as owner, filed its application for a special exception (No. 1760), dated June 10, 1968, and received by the District Council on June 17, 1968, for the 29.275 acre tract "on the east side of Pepco's Takoma/Burtonville TL R/W, fronting on the north side of Metzerott Rd. approx. 2,000 feet easterly of the intersection of Metzerott and Adelphia Roads." The land is located in an R-R (Rural Residential) zone.

There were three hearings before the District Council in regard to the application. The first hearing was on July 17, 1968, at which Pepco officials indicated that the proposed substation would occupy only nine acres of the

29.275 acre tract. It was testified that the remaining land was required to screen the substation adequately from the properties of adjacent landowners. The Soil Conservation Service filed a letter with the District Council indicating that there would be no adverse effect on the adjoining property with respect to the stream which flows through the property. It was indicated also that Maryland-National Capital Park and Planning Commission (Park and Planning Commission) had approved the application subject to five conditions which were acceptable to Pepco and that the Mayor and Council of College Park had recommended approval of the application subject to nine conditions in regard to noise, screening and other matters later mentioned in this opinion—all acceptable to Pepco.

Daniel C. Vaughan, Vice President, Electrical Engineering of Pepco, testified in regard to the need for the proposed substation resulting from the population growth and substantial increase in the use of electric power already mentioned. He stated that there were four outstanding factors to be considered in the selection of a site for the proposed facility:

1. The facility should be adjacent to the existing transmission lines so that Pepco would not have to extend transmission lines out to the substation and back again.
2. It should be of sufficient size and proper shape to permit screening from adjacent properties.
3. It should be adjacent to dedicated roads.
4. It should have natural screening either in the form of contours of the land or trees.

The real estate department of Pepco made a search for a site and found that the 29.275 acre tract was the only site which fulfilled all of the requirements in the area in which it is practicable to build a substation.

Clifford W. Schmitz, Jr., Manager of the Civil and Substation Engineering Department of Pepco, whose de-

partment had charge of the detailed design of the proposed substation, gave the details in regard to the proposed structures and indicated that all transformers would be completely enclosed with noise attenuating structures and that no radio or television interference would be caused by the operation of the substation, pointing out that one of the conditions of approval by the City of College Park—and accepted by Pepco—was that the operation would not add to the noise level in the neighborhood.

Alvin A. Turner, Assistant Manager of the Real Estate Department of Pepco, testified that he had made a study in regard to possible effects on the values of adjacent properties from the installation and operation of the substation. In his opinion, there would be no adverse effect upon such values, based upon studies by independent consultants and upon the effect of similar substations within the general tract.

Melvin R. Chewning, the Manager of Pepco's Real Estate Department who had been with Pepco for 31 or 32 years, testified in regard to the consideration of other possible sites and stated why they would not be suitable for the proposed installation and that the 29.275 acre tract in College Park was the only suitable site.

The opposition to the granting of the application came primarily from the College Park Woods Citizens Association. Its president, in testifying on behalf of the Association, recognized the need for the proposed facility but thought it should be located elsewhere. He stated that the Park and Planning Commission had seriously considered recommending to the District Council that the hearing be postponed until the Technical Staff of the Park and Planning Commission could, with the Pepco officials, evaluate possible sites to ascertain whether the substation could be located somewhere else.

Dr. J. Neil Birch, an Electrical Engineer and a member of the faculty of Catholic University of America, who is employed by Magnavox Corporation and is a resi-

dent and property owner in College Park Woods, testified that he thought alternative sites could be used for the substation; that operation of the proposed substation "could in the future cause us great difficulties"; and that the District Council should allow the Park and Planning Commission to conduct a thorough alternative survey, indicating that he was highly confident that it would result in its recommendation of an alternate site.

Mr. Vaughan, in rebuttal, testified that, in his opinion, Dr. Birch was not "familiar with the requirements as far as getting transmission lines away from these sites to the distribution substations."

The District Council denied the application stating that the applicant had not proved "beyond any reasonable doubt" that the substation could not be located elsewhere, but made no findings of fact or conclusions of law as required by Section 59-104 of the Prince George's County Code of Public Local Laws.

Pepco took an appeal from this decision of the District Council to the Circuit Court. Judge Loveless, on February 17, 1969, remanded the case to the District Council with instructions to make basic findings of fact and conclusions of law as required by Section 59-104 and suggested to the District Council that the Park and Planning Commission might investigate alternative sites and report to the District Council as recommended by those opposing the granting of the application.

Thereafter, the District Council did request the Park and Planning Commission to make the study suggested by the Circuit Court. After making the study, the Park and Planning Commission, on April 30, 1969, filed its comprehensive report.

In the Report, the engineering and economic criteria used were listed as follows:

"1. that it be located adjacent to the main (230 KV) power line from which its supply is obtained;

"2. that it be central to the area it is to serve;

"3. that it be reasonably adjacent to a 69KV distribution system;

"4. that it be adjacent to a good road to enable the necessary heavy equipment to be moved in and replaced by truck."

It was further stated in the Report that the outer limit of the Pepco franchise area was approximately the line of the proposed outer Beltway.

Four possible sites were considered in the Report. They were:

*Site A—North of Sellman Road.*

Site A is a 15 acre triangle bounded on the west by the main transmission line of Pepco and on the south by Sellman Road. Unless site A were substantially enlarged by acquiring a nursery and private dwellings immediately to the east, the site would be too small for other than the transformer station itself. Farther to the east is park land owned by the Park and Planning Commission. The close proximity of dwellings would require intensive screening to insure compatibility. Screening would be difficult because of the elevation of the site. Sellman Road provides direct road access to the site but is not built for heavy traffic. The site being north of the beltway, expensive tunnelling would be required to bring Pepco's 69 KV lines to the south of the Beltway or circuitous routes to tie into existing lines would be required.

*Site B—East of the main power line, immediately north of the Beltway.*

This site is of adequate size for the substation but leaves little room for screening unless two additional private holdings to the north and east were acquired. There is a light screening of trees on the borders of the site; but unless substantial planting were undertaken or until the present trees had grown sufficiently, the site would be exposed to Cherry Hill Road, the Beltway and I-95. The site would not be immediately available since it is being used for storage and a borrow pit in connection

with the present construction of I-95. Again, it would be necessary to cross the Beltway with 69 KV cables. There is road access by Cherry Hill Road.

*Site C—West of the main power line, and bounded by I-95 north of the Beltway.*

This site is located near the interchange of I-95 and the Capital Beltway. The site is of minimal size and leaves little area for screening from I-95. It is heavily wooded and would need to be cleared. There would be a problem resulting from crossing the Beltway with power lines; and inasmuch as the site has a 1 in 8 slope, this would make difficult the movement of heavy equipment. The building of approximately a quarter of a mile of road would be required to connect the site with Cherry Hill Road, either down the steep slope or across the private lands comprising Site B. The two sites at the interchange of the Beltway (Sites B and C) and I-95 will be one of the major gateways both to the Nation's Capital and to Prince George's County. It is poor planning practice to permit the use of these sites as a substation which is not in itself attractive or an enhancement of the gateway aspect. Here again, as in regard to Sites A and B, the problems of adequate screening and access for the 69 KV lines and required heavy equipment preclude the economic use of those sites.

*Site D—University of Maryland lands, north of Metzerott Rd.*

Re-examination of the four possible sites made it apparent to the Technical Staff and to the Park and Planning Commission that the Site D—the site originally favored by Pepco—is the most suitable for the erection of the proposed substation. "A further intensive re-examination has led the staff to believe that the site can be developed as required with a minimum, if any, impact on the adjacent residential lands."

Site D is closest to the ideal location and has sufficient size to provide for adequate screening from adjacent

properties. It has direct access for trucks from Metzerott Road. It is in a depression which enables it to be separated visually from adjacent properties. The presently existing trees will provide immediately the most effective possible screening. It is level and available for immediate use.

The elevations indicate that only the top portion (approximately 107 feet) of the microwave tower—which is an essential part of the automatic operation—would be visible from the most exposed dwelling in the College Park Woods subdivision. All of the remaining structures would be at least 13 feet below the sight line created by the existing trees so that these remaining structures would not be visible from any dwelling.

In regard to the sound emanating from the operation of the substation, Pepco, to ensure that no sounds penetrate the 400-foot barrier, is prepared to covenant that no sounds would be permitted to exceed stipulated levels at the boundary of the proposed development to ensure that there would be no disturbance for the residences.

The Park and Planning Commission concluded and recommended as follows:

*"Conclusion*

"In the light of the foregoing investigations it is the staff's conclusion that the only practical site for the proposed PEPCO transformer station is the location originally chosen on University of Maryland lands north of Metzerott Road, and that the proposed facility would have a minimal, if any, effect on nearby residential properties.

"It is therefore suggested that the Board reaffirm its previous recommendation that the requested use be approved, subject to the following conditions:

"1. That the applicant acquire and amend the application to include the residual land (approximately 200 feet wide) along the

northern side of the subject property to the southwesterly boundary of the College Park Woods subdivision.

"2. That a 400 foot buffer strip be established and maintained in its natural state along the northern line of the property as measured from the College Park Woods subdivision.

"3. That a buffer strip of at least 200 feet in width be established and maintained in its natural state along the easterly and southerly edges of the parcel.

"4. That screen planting be established along the westerly edge of the facility of a type that would ultimately grow as high as the proposed 10-foot chain link fence on its periphery.

"5. That the clearing, grading, and construction procedure be performed in coordination with and under the direction of the United States Soil Conservation Service."

The second hearing before the District Council was held on September 10, 1969. Donald Armstrong, who had personally investigated all of the proposed sites, testified in regard to the Report of the Park and Planning Commission, explaining the reasons why Sites A, B and C were not suitable for the proposed substation and why Site D was suitable. He stated in regard to Site D:

"The Staff therefore looked at the fourth site, the subject of the original PEPCO petition and came to the conclusion that the development as proposed by PEPCO would not have any adverse effect on the surrounding property because the construction proposed would not be seen by any building in the College Park subdivision, and in the report which is before you there is a profile which indicates the lay of the land, the site, which the facility would occupy,

its approximate height, the approximate height of the trees, and the most exposed house and a sight line drawn from the upper part of that which indicates that even the existing towers of the transmission line are several feet below the sight line and, of course, all the construction which PEPCO proposes would be lower than this again."

When questioned on cross-examination in regard to the possible availability as a site of lands immediately adjacent to the Pepco right-of-way owned by the United States Department of Agriculture, Mr. Armstrong stated:

"The lands owned by the Department of Agriculture were excluded from our study because, early in the proceedings, it was made apparent to me by the people that the Department of Agriculture, or at least the Federal Government, is generally reluctant to give up its lands, and in particular most of the lands which abut the power right-of-way are in present use for agricultural experiment."

The Mayor and Council of College Park had also approved of Site D for the installation of the proposed substation subject to nine conditions. The first four conditions were substantially the same as the five conditions recommended by the Park and Planning Commission. Conditions 5, 6, 7, 8 and 9 were as follows:

"5. There shall be no interference in the reception or broadcasting of existing or future electrical equipment, household and otherwise;

"6. No service or transmission lines shall run from the proposed Substation through the College Park Woods subdivision;

"7. The present ambient noise level is to be measured and the proposed Pepco Sub-

station shall not increase this noise level;

"8. The use of the land which Pepco proposes to acquire for this Substation shall be restricted to the personnel required to operate the Substation and Pepco shall be prohibited from using this Substation as a headquarters for personnel, or for the parking, maintenance, or dispatching of vehicular equipment;

"9. Access to the proposed Substation shall be entirely on Pepco property, all access roads to be locked to prohibit use by other traffic and to be policed by Pepco."

Pepco indicated its acceptance of all of the conditions recommended by both the Park and Planning Commission and by the City of College Park.

Some of the Commissioners were not satisfied in regard to the testimony relative to noise and the hearing was adjourned to enable Pepco to produce expert testimony in regard to this matter.

The third hearing was held before the District Council on October 15, 1969. Mr. Schmitz, who had testified for Pepco at the first hearing, explained in detail the location and capacity of the transformers, pointing out that Pepco's Norbeck substation, as far as transformers and the 69 KV arrangement were concerned, was identical with the proposed substation. He testified further that each transformer at Norbeck was completely enclosed by an eight-inch brick wall, with an air gap and on the inside of the enclosure, some fiberglas, so that the sound generated by the transformer "is considerably attenuated and does not come outside of the enclosure." There had been no complaints in regard to noise or otherwise from the operation of the Norbeck substation.

The distance from the site of the proposed substation to the nearest house in the College Park Woods subdivision is 800 feet.

James J. Coles testified on behalf of Pepco as an ex-

pert in regard to noise likely to be produced by the operation of the proposed substation. Mr. Coles was eminently qualified as an expert. He received a Bachelor of Science Degree from Massachusetts Institute of Technology in 1957 and a Master's Degree in 1959 in Electrical Engineering. He took elective courses in acoustics at both the undergraduate and graduate levels. He has written papers for the Acoustical Society of America dealing with sound-induced vibration of structures and the malfunction of electronic components when exposed to intense sound fields. For many years he had been engaged continuously in the acoustical aspects of engineering, particularly in the area of architectural acoustics and noise control, and is the senior consultant with Bolt, Branek and Newman, Inc., a company engaged in consulting, research and development in engineering and the physical and social sciences. He has testified as an expert witness in this field before the courts and administrative bodies.

Mr. Coles had made elaborate tests at the Norbeck operation. Without giving the scientific and other details of his testimony, his conclusion was as follows:

> "Our conclusion is that the noise from the transformer will be below the ambient noise level in the College Park subdivision and, further, that the noise level from the transformer will be virtually inaudible in the College Park Woods subdivision."

Mr. Coles was extensively cross-examined. Dr. Birch finally asked him:

> "Perhaps I should conclude by asking Mr. Coles: Would you place your professional reputation on the line by saying that, if you were Pepco— could you guarantee, given the geometry of the Metzerott Road site, which apparently you are not familiar with, that the noise level produced by the transformers—four of these—would at

various times of the year be below the ambient noise level?

"A. *The noise level will be below the ambient.*" (Emphasis supplied.)

The College Park Woods Citizens Association sought to rebut the testimony offered by Pepco by testimony and written statements of Dr. Birch. He indicated that he had investigated sites other than Site D and thought that there were other sites available which would accommodate the proposed substation without the detrimental effect on neighboring properties which he believed would occur from the erection and operation of the proposed facility.

When asked by counsel for Pepco, however, in regard to his qualifications, the record indicates:

"Q. What experience have you had as an electrical engineer in the designing of substations or transformer sites such as the one proposed, PEPCO?

"A. (Dr. Birch) *Absolutely none.*" (Emphasis supplied.)

The District Council took the matter under advisement and subsequently a vote was taken which resulted, as we have stated, in the vote of two Commissioners to approve, two to deny, with one abstention. There being no majority, the application was denied.

Pepco appealed to the Circuit Court from this ruling of the District Council. Judge Loveless thereafter requested the four Commissioners who voted to state the facts and conclusions of law on which they respectively relied in casting their votes. This was done.

Commissioner Aluisi (then Chairman of the Board of County Commissioners) and Commissioner Baggett, who voted in favor of granting the application, reviewed the facts in some detail, adopted the Report of the Park and Planning Commission, and were of the opinion that Pepco had proved that the approval of the application

was necessary for the public convenience and service, could not be supplied with equal public convenience if located elsewhere, would not endanger the health and safety of workers and/or residents in the community and would not impair or prove detrimental to neighboring properties or their development.

Commissioners Francois and Spellman were of the opinion that Pepco had failed to prove that there were not other sites available with equal public convenience or that noise would not adversely affect the nearby residential properties.

In ruling that the application for the special exception should be granted, Judge Loveless stated in his carefully considered opinion:

> "The applicant-appellant herein [PEPCO] has clearly shown that the proposed use, that of an electrical substation, is absolutely necessary for public convenience and service. . . . The record is void of anything supportive of a contention that the proposed use would endanger the health and safety of workers and/or residents in the area."

As we have indicated, we agree with the findings and conclusions of Judge Loveless. This is one of the rather rare cases in which there is no probative evidence to support the position of the two Commissioners who voted against the granting of the application for the special exception. The great need for the additional facility was established and the testimony and exhibits in the entire record are overwhelming that Site D satisfies the statutory criteria and that no other available sites can supply the service with equal public convenience. There is no credible evidence that noise will adversely affect the surrounding properties. Dr. Birch with refreshing candor testified that he was not familiar with Pepco's technical requirements. He did not show how, if at all, there would be any damage to surrounding properties. As Judge (now Chief Judge) Hammond stated for the

Court in *Board of County Commissioners v. Oakhill Farms*, 232 Md. 274, 192 A. 2d 761 (1963) :

> "Whether the test of substantial evidence on the entire record or the test of against the weight of all the evidence is followed, the courts have exercised restraint so as not to substitute their judgments for that of the agency and not to choose between equally permissible inferences or make independent determinations of fact, because to do so would be exercising a non-judicial role. Rather, they have attempted to decide whether a reasoning mind could reasonably have reached the result the agency reached upon a fair consideration of the fact picture painted by the entire record.
>
> "In the cases dealing with consideration of the weight of the evidence, the matter seems to have come down to whether, all that was before the agency considered, its action was clearly erroneous or, to use the phrase which has become standard in Maryland zoning cases, not fairly debatable. 73 *C.J.S. Public Administrative Bodies and Procedure,* Sec. 225."
> (232 Md. at 283 ; 192 A. 2d at 766.)

Pepco earnestly contends that when public utilities are involved so far as their uses and their location are concerned under applicable zoning laws, the Courts should not apply the zoning laws with "all force and vigor" as would be applied in all other cases. There are authorities which support this contention.

See 2 R. Anderson, *American Law of Zoning* § 9.30 (1968 ed.) where it is stated:

> "In general, an administrative board has a narrower range of discretion in dealing with special-permit applications filed by public utilities than is true in the case of the generality of permit applications. Because the utility fur-

nishes an essential service, denial of permit may have serious consequences, and accordingly may be more closely scrutinized by the courts. *Long Island Lighting Co. v. Griffin,* 272 App. Div. 551, 74 N.Y.S.2d 348 (1947). It is said that the zoning regulations should not be applied to public utilities with 'all force and vigor' [*Koch v. Board of County Commissioners,* 185 Kan. 259, 342 P. 2d 163 (1959)] and that a special permit should be granted to a public utility where the selected site is *reasonably convenient* rather than absolutely necessary. *Baird v. Board of Zoning Appeals,* 347 Ill. App. 158, 106 N.E.2d 343 (1952)." (Emphasis supplied.)

See also *Long Island Water Corp. v. Michaelis,* 28 App. Div. 2d 887, 282 N.Y.S.2d 22 (1967); *Northport Water Works Co. v. Carll,* 133 N.Y.S.2d 859 (1954); *Long Island Lighting Co. v. Long Beach,* 280 App. Div. 823, 113 N.Y.S.2d 762 (1952); and *Petitions of Public Service Electric & Gas Co.,* 100 N. J. Super. 1, 241 A. 2d 15 (1968). We do not find it necessary to pass upon this interesting proposition of law inasmuch as we are of the opinion that even applying the applicable zoning laws with "all force and vigor," the trial court was correct and should be affirmed.

*Judgment affirmed, the appellants to pay the costs.*