# A. H. SMITH SAND & GRAVEL CO. *v.* DEPARTMENT OF WATER RESOURCES

[No. 102, September Term, 1973.]

*Decided January 4, 1974.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and LEVINE, JJ.

*C. Edward Hartman, II*, with whom were *Hartman & Crain* on the brief, for appellant.

*Warren K. Rich, Special Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *John B. Griffith, Special Assistant Attorney General,* on the brief, for appellee.

*Amicus Curiae* brief filed by Institute for Public Interest Representation, *Robert Jacques, Victor H. Kramer, Richard B. Wolf* and *Andrew Hecht* on the brief.

SMITH, J.. delivered the opinion of the Court.

Appellant and cross-appellee, A. H. Smith Sand & Gravel Co. (Smith), here claims error because a trial judge (Taylor, J.) approved that portion of an order of the Department of Water Resources (the Department), appellee and cross-appellant, which required that "no filling operations shall take place within the 50-year floodplain boundaries [on Smith's land] without obtaining a *permit* from the Department for such activities." (Emphasis in the order.) The Department claims the trial judge erred when he modified its order by changing the boundaries of the floodplain as determined by the Department. We find no error in either instance.

The area in controversy here is at Branchville in Prince George's County, south of the Capital Beltway, east of the Baltimore and Ohio Railroad, and north of Greenbelt Road. Smith has carried on a sand and gravel operation at this location for about 50 years. As Mr. Alfred H. Smith, its principal, put it, when he bought some of the land at the site in 1926, in one part "there was a cornfield with a small, little brook running through it." Indian Creek, a branch of the Anacostia River, is the stream here in controversy. In 1926 the "little, small brook . . . was probably six to eight inches deep and probably eight feet wide. It ran the length of the property on down to the bridge, what was known as the old Branchville Road. There it widened out a little bit, because the horses and teams used to go through the water, to probably 20 feet wide there and about six or seven inches deep. From there it came in again and went on down to Berwyn, Lakeland, into College Park and Northwest

Branch." Much has changed since then. Part of the change consists of the lakes dug by Smith in the process of extracting sand and gravel. The most important change, however, is the vast increase in population of the area, accompanied by much greater concern on the part of citizens generally relative to matters affecting the environment in which they live.

Sand and gravel are washed in their processing. Many years ago this brought Smith's operation to the attention of the Department's predecessor, the Maryland Water Pollution Control Commission. It instituted a suit in the Circuit Court for Prince George's County "for the purpose of controlling what the Commission conceive[d] to be a serious pollution by [Smith] of the water of Indian Creek." Chief Judge John B. Gray, Jr., signed a decree in that case in 1950 requiring Smith to take steps calculated to eliminate the pollution then existing. The court retained jurisdiction for the purpose of enforcing the decree and of determining whether or not the alternate method adopted by Smith effectually controlled the settleable solids in the wash water or effluent flowing from its operations into Indian Creek so that such settleable solids in wash water or effluent conformed to the tolerances permitted by the regulations of the commission.

Smith's operation has been inspected many times since then. In fact, Mr. Smith said that personnel from the Department and its predecessors have inspected this operation "every two or three weeks right along" over the intervening 20 years.

Smith was served with a series of letters of complaint which specified alleged violations occurring in August and September, 1970. It was as a result of the departmental hearing relative to those alleged violations that this matter reached the courts.

By Chapter 243 of the Acts of 1970, codified as Code (1973 Cum. Supp.) Art. 96A, §§ 23-29D inclusive, the former subtitle on pollution abatement was repealed and a new subtitle enacted. By § 24(e) the definition of "[w]aters of the State" includes "the floodplain of free-flowing waters on the

basis of a fifty (50) year flood frequency . . . ." Section 2 of Art. 96A sets forth the definitions for the entire article "unless the context clearly provides otherwise." The term "[w]aters of the State" is defined in § 2(e) as including "[t]he flood plain of free-flowing waters as determined by the Department on the basis of the 50-year flood frequency . . . ." A "pollutant" is defined in § 24(b) as "any wastes or wastewaters discharged from any . . . industrial source and all other liquid, gaseous, solid or other substances which will pollute any waters of the State." "Pollution" is defined in § 24(a) as "such contamination or other alteration of the physical, chemical or biological properties, of any waters of the State, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge or deposit of any organic matter, harmful organisms, liquid, gaseous, solid, radioactive, or other substance into any waters of the State as will render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life." By § 27(a) the Department is granted the right to "set water quality and effluent standards to be applicable to the waters of this State or portions thereof." By § 27(b) it is granted the right to "adopt, amend, or repeal procedural rules necessary to accomplish the purposes of [that] subtitle."

Regulations adopted by the Department prohibit the placement of "buildings or other structures . . . within the lines showing the floodplain of any stream or body of water included within the nontidal waters of the State" and forbid "floodplain encroachment by land filling" except, in both instances, "as provided in Section 8.05.03.05D (3)." That section provides:

"(3) The Department may establish floodplain encroachment limit lines in cooperation with appropriate county agencies when such encroachment has been determined to be in the public interest. Such encroachments shall be planned based upon a complete hydrologic

study of the watershed. Encroachments shall be structures of permanent construction or of compacted earth fill and shall conform to planned dimensions."

On appeal, the Circuit Court for Prince George's County found pollution by Smith, upheld the provision relative to permits, and redelineated the floodplain upon the basis of testimony concerning the level of water as a result of hurricane "Agnes," a storm producing flood conditions thought to occur less frequently than once in 50 years.

Smith says in its brief:

"However, the 'corrective' action regarding 'pollution' sought by the Department and promptly implemented by Smith, have essentially resolved any pollution issue. Consequently, no appeal is taken from the adverse finding of the Court below respecting pollution. Appellant may thereby concentrate on the important issue of taking without compensation brought about by the Department appropriating Smith's land for downstream flood control."

Smith sees the points of this case as being:

"1. Does the pollution abatement subtitle (article 96A, sections 23 through 29) give authority to the Department of Water Resources to appropriate fifty year floodplain land for flood control purposes?

"2. Do the water resources orders of December 17, 1970, February 5, 1971 and August 24, 1971 as affirmed by the Circuit Court for Prince George's County constitute an unreasonable restriction upon appellant's property for a public purpose so as to constitute an unlawful taking?

"3. Does the existence of a possibility of reverter to appellant (i.e. the possibility that the Department might grant a permit after the

possibility that it might conduct a study) render the otherwise unlawful taking lawful?"

Smith points out that in one of the Department's orders it was specified, after definition of the floodplain, that pursuant to the Department's regulations Smith would "be required to obtain a permit from the Department of Water Resources for any further fill operations, involving concrete, earth, or any other matter which is placed or dumped or allowed to accumulate within the above defined floodplain." It further points to one of the conclusions of the hearing officer:

"Mr. Smith has alleged that regulations by the State of his operations in the 50 year flood plain of Indian Creek would amount to an unconstitutional taking of his property without compensation, and would force him to close his operations within 6 to 8 months. Mr. Smith did not, however, support this allegation with any evidence, and the hearing officer thus concludes that, since Mr. Smith's property extends beyond the limits of the flood plain, regulation by the State of the activities of the A. H. Smith Sand and Gravel Company in the flood plain of Indian Creek will not in fact prohibit the operations which Mr. Smith has conducted there for many years."

It is from all of this that Smith reaches the conclusion that it is being denied use of its property and that its property is being appropriated without compensation. We disagree.

It is contended by Smith that because flood control and land use control are dealt with in other sections of Art. 96A, *e.g.*, §§ 50-53A (co-operative efforts with other governmental bodies and provision for acquisition of certain property rights), § 65 (contained within the Susquehanna River Basin Compact), and §§ 108-10 (contained within the sediment control subtitle), that the Department has no power with regard to floodplain control under the pollution abatement subtitle.

In *Thomas v. Police Commissioner*, 211 Md. 357, 127 A. 2d 625 (1956), Judge Hammond said for the Court:

> "It is a hornbook rule of statutory construction that, in ascertaining the intention of the Legislature, all parts of a statute are to be read together to find the intention as to any one part and that all parts are to be reconciled and harmonized if possible. *Bickel v. Nice*, 173 Md. 1, 6; *Baltimore v. Deegan*, 163 Md. 234, 238; *Pittman v. Housing Authority*, 180 Md. 457, 463; *Maguire v. State*, 192 Md. 615, 623; *Frazier v. Warfield*, 13 Md. 279, 301. A corollary rule of construction is that if there is no clear indication to the contrary and it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory. This was stated negatively in *Pressman v. State Tax Commission*, 204 Md. 78, where it was noted that words in a statute may be rejected as surplusage if they are incapable of any sensible meaning or are repugnant to the rest of the statute and tend to nullify it." *Id.* at 361.

*Accord, Anne Arundel County v. Moushabek*, 269 Md. 419, 306 A. 2d 517 (1973); *Parker v. Junior Press Printing*, 266 Md. 721, 725, 296 A. 2d 377 (1972); *Prince George's County v. Beard*, 266 Md. 83, 91, 291 A. 2d 636 (1972); and *Baltimore City v. United Stores*, 250 Md. 361, 368, 243 A. 2d 521 (1968).

To hold as Smith would have us hold would render nugatory the phrases of §§ 2(e) and 24(e) with regard to the 50-year floodplain's being included in the definition of "[w]aters of the State." Smith virtually concedes this point in his reply brief where it is stated:

> "But Smith is not attacking the statute *or* even Regulation 3.5, nor does he desire a special exception or even a permit. He wishes merely to be *relieved* of the existing injunction."
> (Emphasis in original.)

Smith also states in its brief:

"There is no doubt that a state, through legislative action, can *regulate* the use of private property by the owner when it is in the public interest or the general welfare to do so, but the important question is how far can regulation be carried before it amounts to a taking in violation of the due process clause of the state and federal constitutions. When does 'regulation' become 'appropriation'? *The answer depends upon the facts of each case*, but in Smith's case, the Department has gone too far." (First emphasis in original. Second emphasis added.)

Thus, it is conceded by Smith that the constitutional attack is not upon the validity of the legislation as enacted, but upon the application of the general statutory plan to a particular situation.

The Department points to *Chertkof Trust v. Department of Natural Resources*, 265 Md. 291, 289 A. 2d 314 (1972); *Poe v. Baltimore City*, 241 Md. 303, 216 A. 2d 707 (1966); and *Schneider v. Pullen*, 198 Md. 64, 81 A. 2d 226 (1951), and urges that before Smith can be heard in an attack upon the validity of the statutory plan as applied to its situation, it must first exhaust its administrative remedies by applying for a permit. We agree, notwithstanding Smith's contention that it did not commence the litigation and that it "cannot be premature in a suit that [it] did not institute, any more than the State can complain about prematurity in the action it did commence."

The State has a legitimate interest in seeing that floodplains are not unduly restricted. *See* 4 Clark, *Waters and Water Rights* § 313.4 (1970); N. Hines *et al.*, *Suggestions for a Model Flood Plain Zoning Ordinance*, 5 Land and Water Law Rev. 321 (1970); Note, *Flood Plain Zoning for Flood Loss Control*, 50 Iowa L. Rev. 552 (1965); and E. Beuchert, *Zoning on the Flood Plain* 49 A.B.A.J. 258 (1963). The General Assembly expressed that concern in its enactment. It is obvious that certain types of use of floodplains may either raise flood levels in other portions of a watershed so that it will be necessary to take action, at

public expense, calculated to protect againt flooding or construction in the floodplain itself may at a later time bring a hue and cry for protection of the buildings erected in the floodplain from the hazard of flooding. Of course, this protection also would be envisioned as being at public expense. These statutes and this regulation only provide for intelligent planning of land use. They are facially constitutional. Accordingly, to determine whether the plan as it affects Smith's land is valid, Smith must first exhaust its administrative remedies by making application for a permit as required by the Department, since upon a proper application a record would be developed. With that record before it, a court would be in a position to intelligently decide whether the Department in applying that general statutory plan to Smith's particular situation infringed upon Smith's constitutional rights. At this point we have no adequate record to make such a determination.

Smith draws the inference from certain statements in the testimony, a point hotly disputed by the Department, that if it were to apply for a permit its application might languish in the Department for months or even years without action while the Department does what it regards as the necessary studies. Smith stated at oral argument that it actually made application in June, 1973, and that the Department had as yet taken no action on the application. The Department also hotly disputes this. *If* Smith did make an application, the Department might well be awaiting the outcome of this case before determining whether to grant the permit. In any event, whether Smith previously made application or whether Smith subsequently makes application, the courts will be open for consideration of such proceedings as Smith may elect to bring in the event the Department unduly delays processing of an application. As Judge Sloan observed for the Court in *Stark v. Board of Registration,* 179 Md. 276, 284-85, 19 A. 2d 716 (1941), the writ of mandamus "may be issued to compel a hearing or to come to a decision. *Miles v. Stevenson,* 80 Md. 358, 364, 30 A. 646; *Manger v. Board of State Medical Examiners,* 90 Md. 659, 45 A. 891; *Maryland State Funeral Directors*

*Association v. State Board of Undertakers*, 150 Md. 294, 133 A. 62; *Weer v. Page*, 155 Md. 86, 141 A. 518." *Accord, Masson v. Reindollar*, 193 Md. 683, 689, 69 A. 2d 482 (1949), and *County Commrs. of A. A. Co. v. Buch*, 190 Md. 394, 402, 58 A. 2d 672, 5 A.L.R.2d 569 (1948).

We now turn to an evaluation of the change of the floodplain delineation by the trial judge. The Administrative Procedure Act, the statute under which this case reached the circuit court, provides in Code (1957, 1971 Repl. Vol.) Art. 41, § 255(g), in the matter of judicial review, that " [t]he court may . . . reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

\* \* \*

"(6) Against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency and including de novo evidence taken in open court . . . ."

Section 255(e) provides for the taking of additional evidence " [i]f, before the date set for hearing, application is made to the court for leave to present additional evidence on the issues in the case, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency . . . ."

At a pretrial conference Smith indicated its desire to present additional evidence. An application was submitted. On January 12, 1973, the circuit court passed an order granting leave for "the taking of additional testimony on the issue of the effect of Hurricane Agnes upon [sic] the Department of Water Resources." The matter was heard on January 31, 1973, pursuant to a trial date set on November 14, 1972. The determination by the Department as to the floodplain was made on August 24, 1971. The storm "Agnes" took place in June of 1972, subsequent to the Department's hearing.

Smith's expert testified, and counsel for Smith conceded,

that there was no basic disagreement between the parties concerning the studies of the floodplain done in 1970. It was said that because of the lack of an actual storm certain assumptions had to be made in 1970 relative to storm water and that those assumptions were reasonably made. There was an estimate of the drainage area from geological survey quadrangle sheets including assumptions as to exact drainage divide lines. There was an assumption of the time of concentration, that is the time for a drop of water to go from the farthest point in the watershed to a point in question. There was an estimate of rainfall based upon statistical records. There were estimates of the amount of water which would run off particular tracts of land based on the land use. There were also assumptions based on storage through the use of undersized pipes, a factor which would affect the amount of water that would run off at any given point and how much would be detained at those points. Based upon those factors, estimates were made of the level that would be reached by a 50 year flood, that is, the type of flood calculated to take place once in 50 years. As Smith's expert put it, the methods used in making the initial determination were "the state of the art at that time and it didn't have the benefit of a large storm such as Agnes to correlate that data with." He distinguished between a 50-year storm and a 50-year flood. He said that a 50-year storm is the maximum amount of rain that would occur over an average of 50 years while the 50-year run off would be if one kept records at a gauge and recorded the amount of water that went by, the run off rather than the storm determining a 50 year flood. He regarded Agnes as greater in intensity than a 50 year storm and calculated that at the Smith property the flood from Agnes was 1.4 times a 50-year flood.

Although the Department's expert questioned some of the bases upon which Smith's expert rested his conclusions, including, specifically, that he did not take into account future development which the Department's expert and the Department regard as necessary in determining the boundaries of a floodplain, there was no quarrel with the

statement by Smith's expert that storm Agnes was more severe than a 50-year storm or a 50-year flood.

Judge Taylor said in his opinion, relative to the testimony of Smith's expert:

"The evidence indicates that Mr. Smith's expert agreed that the method of calculation of the floodplain employed by the Department was the accepted method. However, its computations were made before Agnes, while Smith's computations of the floodplain of Indian Creek were made subsequent thereto. Although the difference between the elevations arrived at by the different studies is no greater than 2+ feet, this difference projected over an area 5,000 feet deep and 1800 feet wide is indeed appreciable. The Court is aware that the data from which the Department's computations were made was derived from storms occurring over the past 40 years, but not Agnes. It is felt that the immediate data resulting from the retention of the Agnes waters forms a more enlightened basis for the determination of the floodplain of Indian Creek. Therefore, the Court adopts the limit of the 50 year floodplain along the east side of Indian Creek as established by the testimony of Mr. B. Edward Prescott. Those limits are:

| Horizontal Distance Upstream from Greenbelt Road (In feet) | Elevation (In feet) |
|---|---|
| 0 | 61.4 |
| 1000 | 65.0 |
| 2000 | 66.7 |
| 3000 | 67.2 |
| 4000 | 67.25 |
| 5000 | 67.4" |

He directed that the floodplain, as determined by the Department, be modified in conformity with his opinion.

The Department argues that " [m]ost importantly, [Smith's expert] did not take into consideration future

development which forms the basis for the definition of the floodplain. Recalculation of the floodplain boundaries subsequent to individual storms would leave all planning and land use regulations in a state of flux. It is for this reason that floodplains are delineated based upon conditions of full development. The Maryland survey was accomplished in that manner in accordance with the Maryland National Park and Planning Commission Master Plan." We disagree with the Department's theory.

We are not obligated at this time to determine what should or should not be taken into consideration in planning.[1] The issue here is a jurisdictional one insofar as the Department is concerned. Its jurisdiction extends to the floodplain on the basis of a 50-year flood frequency. If the floodplain were to be determined upon the basis of "future development," then inevitably the questions that would arise would include as of what date the future development should be determined and what the future development would be. There is some indication here that the culvert installed under Greenbelt Road by the State actually restricts the flow of water and, therefore, raises the potential flood level. If one were to determine the floodplain upon the basis of future development, then certainly a question would arise as to whether such future development would provide for pulling the stopper out of the bottle, so to speak, by enlarging that culvert. We see nothing in this statute indicating an intent on the part of the General Assembly that a determination of the floodplain should be on the basis of development at some time in the future. The

---

**1.** In this regard we find it interesting to note that the model floodplain zoning ordinance set forth in Hines, *et al.*, *Suggestions for a Model Flood Plain Zoning Ordinance, op. cit.* at 347, provides for altering boundaries of a floodway district when "flood data compiled subsequent to the enactment of [the] ordinance indicate that the boundaries of the district as shown on the zoning map of the city have been incorrectly located," and the model ordinance in the Note, *Flood Plain Zoning for Flood Loss Control, op. cit.* at 580, provides for modification "upon a showing:

  (1) that natural or human factors have, upon the basis of competent engineering study, substantially altered the danger of flood loss, or
  (2) that the originally designated areas are, upon the basis of competent engineering study, improperly located."

plain meaning of the words in the statute is that the jurisdiction of the Department extends to the floodplain on the basis of a 50-year flood frequency using the hypothesis of conditions as they exist at the time of the determination.

The standard to be applied by a court in reviewing an appeal under the Administrative Procedure Act was succinctly set forth by Judge Horney in *Bernstein v. Real Estate Comm.*, 221 Md. 221, 156 A. 2d 657 (1959), *appeal dismissed*, 363 U. S. 419, 80 S. Ct. 1257, 4 L.Ed.2d 1515, *rehearing denied*, 364 U. S. 855, 81 S. Ct. 35, 5 L.Ed.2d 79 (1960), where he said for the Court:

> "While it appears that the scope of judicial review by a trial court of the findings, inferences, conclusions and decisions of administrative agencies under the statute has been broadened to some extent, it is clear that the statute did not intend that the court should substitute its judgment for the *expertise* [1] of those persons who constitute the administrative agency from which the appeal is taken. Cf. *Maryland Racing Commission v. McGee*, 212 Md. 69, 80, 128 A. 2d 419, 425 (1957). See also *Marino v. City of Baltimore*, 215 Md. 206, 222, 137 A. 2d 198, 205 (1957).
>
> "Generally, when the entire record shows that the findings of fact and conclusions of law are supported by competent, material and substantial evidence taken before the agency and such *de novo* evidence, if any, as may be taken by the court, and such findings and conclusions are not against the weight of such evidence, it is the function of the court to affirm the order of the agency or remand the case for further proceedings if that be necessary. On the other hand, if the court should find that the substantial rights of a petitioner for review have been prejudiced, by one or more of the causes specified in § 255(g) (1)-(8) [of Art. 41], because of an administrative finding, inference,

conclusion or decision, then it is the function of the court to reverse or modify the order."

"1. The statute [Sec. 252(d)] specifically provides that agencies 'may utilize their experience, technical competence and specialized knowledge' in evaluating the evidence." *Id.* at 230.

The Department refers to the expertise of the agency in this instance. This Court has observed that an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant. *See Surkovich v. Doub,* 258 Md. 263, 272, 265 A. 2d 447 (1970); *Creswell v. Baltimore Aviation,* 257 Md. 712, 264 A. 2d 838 (1970); and *Miller v. Abrahams,* 239 Md. 263, 273, 211 A. 2d 309 (1965). The conclusion reached by an administrative agency, with all of its expertise, can be no more sound than the factual basis upon which it rests. There was evidence presented here from which the trial judge could conclude, as he did conclude, that the Department at the time it made its determination as to the floodplain just did not have before it information as exact as was available after storm Agnes. It was from data arising from that storm that Smith's expert reached his conclusion upon which the trial court based its determination. This is not a case of a court's substituting its judgment for that of the agency, but a case of the court's having made a determination upon the basis of additional information. In that circumstance we conclude that the trial judge did not err in modifying the delineation of the floodplain.

*Order affirmed; costs to be divided between the parties.*