ROGER SCHULTZ ET AL. *v.* ROBERT K. PRITTS ET AL.

[No. 153, September Term, 1979.]

*Decided July 16, 1981.*

The cause was argued and reargued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

Argued and reargued by *John T. Willis,* with whom were *Willis & Leahy* on the brief, for appellants.

Argued and reargued by *William B. Dulany,* with whom were *Wesley D. Blakeslee* and *Dulany & Davis* on the brief, for appellees.

DAVIDSON, J., delivered the opinion of the Court. SMITH, J., concurs in part and dissents in part and filed a concurring and dissenting opinion at page 24 *infra.*

This case presents three questions. The first question is whether an order of the Circuit Court for Carroll County remanding a proceeding to the Carroll County Board of Zoning Appeals (Board) was a final judgment from which an appeal may be taken under Maryland Code (1974, 1980 Repl. Vol.), § 12-301 of the Courts and Judicial Proceedings Article. The second question is whether the Board's consideration of written evidence filed subsequent to the close of a hearing constituted a denial of due process of law under the fourteenth amendment of the United States Constitution. The third question is whether the Board's denial of the conditional or special exception use [1] requested in this case was arbitrary, capricious, and illegal.

The respondents, Robert and Ann Pritts, are contract purchasers of a 2.74 acre tract of land located in Carroll County, zoned R-20,000 (single-family residential development — 20,000 square feet minimum lot size). These contract purchasers filed an application with the Board requesting a

---

1. For the purposes of this opinion, the terms "special exception use" and "conditional use" are synonomous. Zellinger v. CRC Dev. Corp., 281 Md. 614, 619 n. 4, 380 A.2d 1064, 1967 n. 4 (1977); Rockville Fuel & Feed Co. v. Board of Appeals of Gaithersburg, 257 Md. 183, 187, 262 A.2d 499, 502 (1970).

special exception use to develop a funeral establishment and a variance for reduction of the minimum front yard requirements. The Board held a hearing at which the petitioners, Roger Schultz and others (protestants), appeared in opposition. After the hearing, the Board denied the requested special exception use and held that the request for the variance was moot.

The contract purchasers appealed to the Circuit Court for Carroll County which determined that there had been a denial of due process because the Board had considered evidence submitted after the close of the hearing. The Circuit Court reversed and remanded the matter to the Board for a new hearing. That Court specifically refused to consider the merits of the case and to decide whether a standard set forth in *Gowl v. Atlantic Richfield Co.,* 27 Md. App. 410, 417-18, 341 A.2d 832, 836 (1975), was an appropriate standard to be applied on remand in determining whether the special exception use should be granted.

The protestants appealed to the Court of Special Appeals. The contract purchasers cross-appealed on the ground that the Circuit Court should have granted the special exception use. The Court of Special Appeals determined on its own motion that the Circuit Court's order remanding the case to the Board was not a final judgment and dismissed the appeal. That Court did not consider the merits of the case and did not decide whether the standard set forth in *Gowl* was an appropriate standard to be applied on remand in determining whether the special exception use should be granted.

The protestants filed a petition for a writ of certiorari, and the contract purchasers filed a cross petition. We granted both the petition and the cross petition. The case was argued on 3 June 1980. On 28 April 1981 a reargument was held limited to the following questions:

> "(1) Was an appropriate standard established in *Gowl* . . . which held that it is arbitrary, capricious and illegal for a Board of Appeals to deny an appli-

cation for a special exception when 'the potential volume of traffic under the requested use would appear to be no greater than that which would arise from permitted uses'?

(2) Is the evidence sufficient when viewed in light of the standard deemed to be appropriate?"

We have determined that the standard established in *Gowl* is inappropriate and that in the interest of justice we shall remand the case to the Board for further proceedings without affirmance or reversal.

## I

### Final Judgment

The protestants contend and the contract purchasers concede that the Circuit Court's remand order was a final judgment and that the appeal should not have been dismissed. We agree.

Maryland Code (1974, 1980 Repl. Vol.) § 12-301 of the Courts and Judicial Proceedings Article provides in pertinent part:

"[A] party may appeal from a final judgment entered in a civil . . . case by a circuit court."

Maryland Code § 12-101 (f) of the Courts and Judicial Proceedings Article provides:

" 'Final judgment' means a judgment, decree, sentence, order, determination, decision, or other action by a court, including an orphans' court, from which an appeal, application for leave to appeal, or petition for certiorari may be taken."

The statutory definition of "final judgment" in § 12-101 (f) has been explicated by case law. *Fred W. Allnutt, Inc. v. Commissioner of Labor & Industry,* 289 Md. 35, 40, 421 A.2d 1360, 1362-63 (1980); *Warren v. State,* 281 Md. 179, 183, 377 A.2d 1169, 1171 (1977). This Court has consistently stated

that a judgment or order of a court is final when it determines or concludes the rights of parties or when it denies the parties means of further prosecuting or defending their rights and interests in the subject matter of the proceeding. *Fred W. Allnutt, Inc.,* 289 Md. at 40, 421 A.2d at 1363; *Department of Pub. Safety & Correctional Servs. v. LeVan,* 288 Md. 533, 542-43, 419 A.2d 1052, 1057 (1980); *Boteler v. State,* 7 G. & J. 109, 112-13 (1835).

More particularly, we have recently reiterated that a circuit court's order remanding a proceeding to an administrative agency is an appealable final order. *LeVan,* 288 Md. at 542-43, 419 A.2d at 1057; *Criminal Injuries Compensation Bd. v. Remson,* 282 Md. 168, 177, 384 A.2d 58, 64 (1978). *See Allen v. Glenn L. Martin Co.,* 188 Md. 290, 294-95, 52 A.2d 605, 607 (1947). When a court remands a proceeding to an administrative agency, the matter reverts to the processes of the agency, and there is nothing further for the court to do. Such an order is an appealable final order because it terminates the judicial proceeding and denies the parties means of further prosecuting or defending their rights in the judicial proceeding. *Fred W. Allnutt, Inc.,* 289 Md. at 40, 421 A.2d at 1363.

In this case, the Circuit Court's order remanded the proceeding to the Board, a local administrative agency. As a result, the matter reverted to the Board, and there was nothing further for the Circuit Court to do. Thus, the parties were denied the means of further prosecuting or defending their rights and interests in the judicial proceeding. The Circuit Court's order was an appealable final order.[2] Accordingly, we shall vacate the judgment of the Court of Special Appeals which dismissed the appeal as premature.

---

**2.** In Hayden v. Walker, 208 Md. 114, 115, 117 A.2d 109, 109 (1955) (per curiam), this Court held that a circuit court's order remanding a proceeding to a local board of appeals was not an appealable final order. In *LeVan,* we overruled not only United States Fire Insurance Co. v. Schwartz, 280 Md. 518, 374 A.2d 896 (1977), but also "any cases with a similar holding." LeVan, 288 Md. at 544, 419 A.2d at 1057. Because the holding in *Hayden* is similar, it is one of the cases overruled in *LeVan.*

## II

## Due Process

The protestants next contend that the contract purchasers were not denied due process of law under the fourteenth amendment of the United States Constitution.[3] While they concede that the Board considered evidence received after the close of the hearing, they claim that the contract purchasers' due process rights were not violated because the contract purchasers acquiesced in the submission of the evidence and because the evidence considered was cumulative to that presented at the hearing. We agree.

In general, while administrative agencies are not bound by the technical common law rules of evidence, they must observe the basic rules of fairness as to parties appearing before them. *Ottenheimer Publishers, Inc. v. Employment Sec. Admin.,* 275 Md. 514, 520, 340 A.2d 701, 704 (1975); *Hyson v. Montgomery County Council,* 242 Md. 55, 69, 217 A.2d 578, 587 (1966); *Dal Maso v. Board of County Comm'rs of Prince George's County,* 238 Md. 333, 337, 209 A.2d 62, 64 (1965). When an administrative agency relies upon evidence submitted after the close of a hearing, due process may be violated if no opportunity is provided to challenge the evidence by cross-examination or rebuttal. *Rogers v. Radio Shack,* 271 Md. 126, 129, 314 A.2d 113, 115 (1974); *Temmink v. Board of Zoning Appeals for Baltimore County,* 205 Md. 489, 496-97, 109 A.2d 85, 88-89 (1954). However, when an administrative agency relies upon evidence submitted after the close of a hearing, there may be no due process violation when the parties are aware that the evidence will be considered but make no objection, particularly if the evidence is duplicative in nature. Under such circumstances, the requisite procedural fairness has been accorded because there was the opportunity to challenge the original evidence by cross-examination or rebuttal or to request the opportu-

---

**3.** U.S. Const., amend XIV provides in pertinent part:

"No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."

nity to challenge the newly acquired evidence before the agency reached its decision. *Dickinson-Tidewater, Inc. v. Supervisor of Assessments of Anne Arundel County,* 273 Md. 245, 254, 329 A.2d 18, 24 (1974); *Montgomery County, Md. v. National Capital Realty Corp.,* 267 Md. 364, 375-76, 297 A.2d 675, 681-82 (1972); *Birckhead v. Board of County Comm'rs for Prince George's County,* 260 Md. 594, 600, 273 A.2d 133, 136 (1971); *Dal Maso,* 238 Md. at 337, 209 A.2d at 65.

Here the record shows that the Board held a hearing on 5 January 1978. At that hearing, Mr. Stephen G. Peterson, a Traffic Planning and Engineering Consultant, qualified as a traffic expert (traffic expert), appeared and testified on behalf of the protestants. He pointed out that the contract purchasers had "indicated that typically a procession takes 5 minutes to exit from the site." He then testified that based upon the contract purchasers' estimate, traffic counts, traffic flow, stop times, and the topography of the subject property, he had concluded that, under certain circumstances, collisions with vehicles waiting for a funeral procession to exit the site might occur. In addition, he testified that funeral processions would have an adverse effect upon emergency vehicles and other traffic attempting to enter or leave a medical center located opposite the site. The contract purchasers did not challenge this evidence by cross-examination or rebuttal.

During the traffic expert's testimony, the following colloquy took place:

> "Mr. Willis [protestants' attorney]: The data that you collected, does that have any regular scheme to it or could you perhaps summarize the total figures and provide that to the Board? Do you have them · with you?
>
> Mr. Peterson: Yes, I could provide them.
>
> Mr. Willis: You have them in pencil. Would the Board desire to have those figures?
>
> Mr. Ulino [Board member]: We would.

Mr. Peterson: I would like to put them in the form of a brief memorandum either to you or to the Board.

Mr. Willis: With a copy to Mr. Hildenbrand, of course.

Mr. Peterson: Surely.

Mr. Willis: Mr. Hildenbrand, do you have any questions?

Mr. Peterson: Or I might provide it to you and you can distribute it.

Mr. Hildenbrand [contract purchasers' attorney]: That would be adequate. . . ."

Thus, at the 5 January 1978 hearing, the contract purchasers knew that after the close of the hearing the Board was going to receive and consider written evidence containing a compilation or summary of the data testifed to by the traffic expert. At that time, they not only failed to object, but indeed acquiesced in the procedure. On 19 January 1978, the traffic expert forwarded to both the Board and to the contract purchasers a written statement containing a compilation of the data that the traffic expert had presented at the hearing. Thus, before the Board had made any determination, the contract purchasers knew the contents of the traffic expert's written statement and that the Board had received that statement. Nevertheless, at that time the contract purchasers raised no objection and did not request a further hearing. On 21 February 1978, the Board, relying upon the traffic expert's testimony, including his written statement, denied the requested special exception use on the sole ground that it would result in dangerous traffic conditions. Thereafter, the contract purchasers requested a rehearing that the Board denied.

Here the record establishes that the evidence submitted after the close of the hearing was duplicative in nature and that the contract purchasers were aware that it would be considered but made no objection. Under these circumstances, the requisite procedural fairness has been accorded

because the contract purchasers had the opportunity to challenge the original evidence by cross-examination or rebuttal or to request the opportunity to challenge the newly acquired evidence before the Board reached its decision. Moreover, under these circumstances, the Board's denial of the requested rehearing was not an abuse of its discretion.[4] Thus, the contract purchasers were not denied due process of law.

## III

## Cross Petition

The contract purchasers contend that the Board's decision denying the requested special exception use was arbitrary, capricious, and illegal. Initially, they assert that the Board did not apply the proper criteria in determining that the requested special exception use would result in dangerous traffic conditions. They claim that the Board failed to take into account the critical fact that the requested special exception use would generate less traffic than would be generated by permitted uses. In support of their position, they rely upon *Gowl v. Atlantic Richfield Co.,* 27 Md. App. 410, 417-18, 341 A.2d 832, 836 (1975).

In *Gowl,* the Court of Special Appeals reversed a Board of Appeals' decision denying a requested special exception use on the ground of traffic. There that Court stated that the proper standard by which to determine whether a requested special exception use should be denied on the ground of traffic is a comparison between the traffic problems that might arise under the requested special exception use and those that might arise under a permitted use. It held that when "the potential volume of traffic under the requested use would appear to be no greater than that which would arise

---

4. The question whether to grant a rehearing is a matter within an administrative agency's sound discretion. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535, 66 S. Ct. 687, 697 (1946); Tidewater Express Lines, Inc. v. United States, 278 F. Supp. 561, 566-67 (D. Md. 1968); Monumental Motor Tours v. United States, 110 F. Supp. 929, 932 (D. Md. 1953) (per curiam).

from permitted uses," the requested special exception use must be granted. *Gowl,* 27 Md. App. at 417-18, 341 A.2d at 836. We do not agree.

This Court has frequently expressed the applicable standards for judicial review of the grant or denial of a special exception use. The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.* The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious, and illegal. *Turner v. Hammond,* 270 Md. 41, 54-55, 310 A.2d 543, 550-51 (1973); *Rockville Fuel & Feed Co. v. Board of Appeals of Gaithersburg,* 257 Md. 183, 187-88, 262 A.2d 499, 502 (1970); *Montgomery County v. Merlands Club, Inc.,* 202 Md.

279, 287, 96 A.2d 261, 264 (1953); *Anderson v. Sawyer,* 23 Md. App. 612, 617, 329 A.2d 716, 720 (1974). These standards dictate that if a requested special exception use is properly determined to have an adverse effect upon neighboring properties in the general area, it must be denied.

The specific nature of the requisite adverse effect was defined in *Deen v. Baltimore Gas & Electric Co.,* 240 Md. 317, 330-31, 214 A.2d 146, 153 (1965). There the Baltimore Gas and Electric Company requested a special exception use that would permit construction of high tension transmission lines above ground. At that time, the Baltimore County Zoning Regulations stated that a special exception use could not be granted if the requested use would "be detrimental to the health, safety, or general welfare of the locality involved." The Baltimore County Board of Appeals (Board) granted the requested special exception use for that portion of the proposed transmission lines that would traverse a rural area not then serviced by public sewer or water facilities. The trial court affirmed.

On appeal, this Court affirmed stating:

"Appellants assert that it was error for the Board to fail to consider the future effects which the high tension wires would have on the health, safety and general welfare of the locality 'which could be reasonably anticipated in the normal course of its development.' This factor was without relevance in this case, because *there was no evidence produced at the hearing which would show that the effect of high tension wires on the future health, safety and welfare of this area would be in any respect different than its effect on any other rural area. Section 502.1 implies that the effect on health, safety or general welfare must be in some sense unique or else a special exception could never be granted in such an area for the above ground location of high tension wires.* The only evidence as to future conditions was testimony revealing the possibility of

future residential development of this land but such a possibility alone does not come close to showing a future deleterious effect upon the public health, safety or general welfare." *Deen,* 240 Md. at 330-31, 214 A.2d at 153 (emphasis added).

Subsequently, a similar analysis was employed in *Anderson v. Sawyer,* 23 Md. App. at 617-18, 329 A.2d at 720. There an owner requested a special exception use that would permit construction of a funeral home in a residential zone. Protestants presented evidence to show that the requested special exception use would tend to create congestion and unsafe conditions on neighboring roads and streets and would have a depressing psychological effect that would interfere with the enjoyment of the adjoining properties, make them less saleable, and prevent them from appreciating in value as much as other homes in the area. The Board found that the grant of the requested special exception use would create traffic problems and would, in fact, "be detrimental otherwise to the general welfare of the locality involved." It denied the requested special exception use. The Circuit Court for Baltimore County reversed.

The Court of Special Appeals affirmed the order of the Circuit Court requiring the grant of the requested special exception use. The Court of Special Appeals agreed with the trial court that there was no probative evidence to show any adverse effect. More particularly, with respect to the alleged depreciation of value and enjoyment of neighboring properties, it said:

> "There can be no doubt that an undertaking business has an inherent depressing and disturbing psychological effect which may adversely affect persons residing in the immediate neighborhood in the enjoyment of their homes and which may lessen the values thereof. Indeed, it is precisely because of such inherent deleterious effects that the action of a local legislature in prohibiting such uses in a given zone or zones will be regarded as promoting the general welfare and as constitutionally sound.

14

But in the instant case the legislature of Baltimore County has determined that as part of its comprehensive plan funeral homes are to be allowed in residential zones notwithstanding their inherent deleterious effects. By defining a funeral home as an appropriate use by way of special exception, the legislature of Baltimore County has, in essence, declared that such uses, if they satisfy the other specific requirements of the ordinance, do promote the health, safety and general welfare of the community. As part of the comprehensive zoning plan this legislative declaration shares in a presumption of validity and correctness which the courts will honor.

*The presumption that the general welfare is promoted by allowing funeral homes in a residential use district, notwithstanding their inherent depressing effects, cannot be overcome unless there are strong and substantial existing facts or circumstances showing that the particularized proposed use has detrimental effects above and beyond the inherent ones ordinarily associated with such uses.* Consequently, the bald allegation that a funeral home use is inherently psychologically depressing and adversely influences adjoining property values, as well as other evidence which confirms that generally accepted conclusion, is insufficient to overcome the presumption that such a use promotes the general welfare of a local community. *Because there were neither facts nor valid reasons to sup-· port the conclusion that the grant of the requested special exception would adversely affect adjoining and surrounding properties in any way other than would result from the location of any funeral home in any residential zone, the evidence presented by the protestants was, in effect, no evidence at all.*" *Anderson,* 23 Md. App. at 624-25, 329 A.2d at 724 (emphasis added) (citations omitted).

These cases establish that a special exception use has an adverse effect and must be denied when it is determined from the facts and circumstances that the grant of the requested special exception use would result in an adverse effect upon adjoining and surrounding properties unique and different from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone. Thus, these cases establish that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

In *Gowl,* the Atlantic Richfield Company requested a special exception use that would permit construction of above ground storage for more than 10 million gallons of fuel oil and gasoline to be located on approximately 19 acres of land zoned M-2 (Manufacturing-Heavy). At a hearing before the Board of Appeals for Howard County (Board), there was much evidence presented to show that the particular use proposed at the particular location proposed would have an adverse effect on neighboring properties in the general area. There was expert and lay testimony to show, among other things, that the access roads to the property were inadequate and dangerous and that the increased traffic could not be accommodated on the existing roads. The Board found, among other things, "that the proposed use would adversely affect the surrounding and vicinal properties by creating undue traffic congestion on a presently inadequate and hazardous road network. . . ." It denied the requested special exception use.

Atlantic Richfield filed an appeal in the Circuit Court for Howard County. In a memorandum opinion filed after a hearing, the trial court said with respect to traffic:

"The finding of the Board that the use would create undue traffic congestion on a presently

inadequate and hazardous road network presents a more serious question. The evidence before the Board was certainly substantial, and more than substantial, that the access roads to the property, in their present state, were inadequate to service the proposed use or, presumably, any substantial industrial use, and that the presence of any number of trailer-trucks on these roads would create a hazard."

In essence, the trial court concluded that there was sufficient evidence to support the Board's finding that the particular use proposed at the particular location proposed would have an adverse effect on traffic above and beyond the adverse effect on traffic ordinarily associated with such uses. Notwithstanding the existence of this adverse effect, the trial court concluded that the Board's denial should be reversed and that the special exception use should be granted. In explanation, the trial court said:

"*The crux of the matter,* as pointed out by counsel for the appellant, *is that the proposed use in this instance* insofar as the evidence before the Board was concerned, *would not create any greater traffic congestion* on the presently inadequate and hazardous road network *than any number of uses permitted as a matter of right under the M-1 and M-2 zoning classifications.* For instance, among the uses permitted as a matter of right in the M-1 zoning district, such uses also being permitted as a matter of right in the M-2 zoning district, are truck terminals and warehouses, wholesale houses, merchandise distribution centers, and the manufacture of cement, cinder or slag products. In the M-2 zoning districts, among other uses permitted as a matter of right are: aircraft manufacture or assembly, automobile or truck assembly plants, food manufacturing, packing or processing plants and bituminous road material mixing plants. *Presumably any or all of these uses permitted as a matter of right in the area in question would create pre-*

*cisely the same, if not a greater, traffic hazard than the use in question here.* The fault, if any, lies not with the use proposed but with the zoning regulations and map in effect at this time. In other words, *an increase in traffic, including trailer trucks, on inadequate roads, is not a factor unique or peculiar to this proposed use.*" (Emphasis added.)

In affirming the trial court, the Court of Special Appeals said:

"[The trial court] went on to point out that in rejecting this application because of possible increase in vehicular traffic, the Board was making a comparison between existing traffic patterns around the presently undeveloped property and traffic patterns that could arise if the proposed use were to be permitted, without considering at all that an even greater volume of traffic than that anticipated for the storage facility could arise from any of several uses for which the property is now zoned and for which no special exception would be required. [It] noted that under the present M-2 zoning, the subject premises could be used for aircraft manufacture or assembly; automobile or truck assembly plants; food manufacturing, packing or processing plants and bituminous road material mixing plants.

We believe it obvious that any one of these permissible uses of these premises could result in increased vehicular traffic of greater volume and density than that which is considered probable for the bulk storage facility, and we do not believe it arguable that it is any more desirable to have a concrete or bituminous mixing vehicle drive past one's home than a gasoline or fuel oil tank truck.

We think it fully appropriate that [the trial court] found *the proper test to be a comparison between the traffic problems that might arise under the proposed use and traffic problems that could arise*

18

*from the usage of the premises now permitted by law.* We recognize that traffic impact is a sufficient basis to deny a zoning application, including an application for a special exception. *Templeton v. County Council,* 21 Md. App. 636, 321 A.2d 778 (1974); *Temmink v. Board of Zoning Appeals,* 212 Md. 6, 128 A.2d 256 (1956); *Hardesty v. Zoning Board,* 211 Md. 172, 126 A.2d 621 (1956). But *traffic impact on an application for a special exception ought to be measured against that which could arise under permissible use, and not merely on existing traffic loads around the undeveloped premises. Where, as here, the potential volume of traffic under the requested use would appear to be no greater than that which would arise from permitted uses, we believe it arbitrary, capricious and illegal to deny the application for special exception on vehicular traffic grounds.*

. . .

Although, as [the trial court] noted, the Board could correctly conclude that the requested use would considerably increase the volume of traffic on the premises over existing traffic patterns and thereby menace the public safety or interfere with the reasonable enjoyment of people in their homes, we also agree with [it] that this reason would be insufficient to deny the application because similar or even more disadvantageous traffic conditions could easily arise if the premises in question were utilized for any of the lawful purposes now permitted under the heavy industrial zoning affecting this property." *Gowl,* 27 Md. App. at 417-20, 341 A.2d at 836-37 (emphasis added).

In essence, the Court of Special Appeals agreed with the trial court that although the particular special exception use proposed at the particular location proposed had an adverse effect on traffic above and beyond that ordinarily associated

with such uses, the requested special exception should be granted.

In reaching this conclusion, the trial court cited only *Deen,* 240 Md. at 330-31, 214 A.2d at 153, and the Court of Special Appeals cited no authority at all. Indeed, there is no persuasive authority that applies the *Gowl* standard or supports this conclusion.[5]

An analysis of the rationale underlying the statutory scheme by which certain uses are delineated as either a permitted use or a conditional or special exception use leads to the conclusion that the *Gowl* standard is logically inconsistent and in conflict with the standards established in *Turner* as explicated by *Deen* and *Anderson.* The general purpose of adequate land planning is to guide and accomplish the "coordinated, adjusted, and harmonious

---

5. The contract purchasers have not cited any case decided by a court of last resort in any other jurisdiction that applies the *Gowl* standard. They have cited only two cases decided by an intermediate appellate court applying the *Gowl* standard. Both of these cases were decided by the Supreme Court, Appellate Division of New York. Long Island Lighting Co. v. Griffin, 272 App. Div. 551, 554, 74 N.Y.S.2d 348, 351 (1947), *aff'd on other grounds,* 297 N.Y. 897, 79 N.E.2d 738 (1948), is nonpersuasive because it involves a request for a special exception by a public utility to which the ordinary standard concerning adverse effect may not apply. *See* County Council for Prince George's County v. Potomac Elec. Power Co., 263 Md. 159, 176-77, 282 A.2d 113, 121 (1971). Hobbs v. Albanese, 70 App. Div. 2d 1049, 1050, 417 N.Y.S.2d 556, 557 (1979), is nonpersuasive because the authority it cites does not articulate the *Gowl* standard and is, therefore, misapplied. In addition, no rationale is offered for the Court's improperly supported conclusion.

We recognize that 3 R. Anderson, *American Law of Zoning* § 19.14, p. 407 (2d ed. 1977) and 3 A. Rathkopf, *The Law of Zoning and Planning* § 41.10, p. 41-61 (4th ed. 1980), cited by the contract purchasers articulate a standard approximating that articulated in *Gowl.* However, those treatises are similarly nonpersuasive because the cases cited do not articulate the *Gowl* standard, and are, therefore, misapplied. For example, some of the cited cases are inapposite because they compare a special exception use to an existing use, not to a permitted use. *See, e.g.,* Baxter v. Gillispie, 60 Misc. 2d 349, 303 N.Y.S.2d 290, 292, 294-96 (1969). Others are inapposite because a comparison between the adverse effect of a special exception use and that of a permitted use is considered to be an appropriate factor to be taken into account, but is not relied upon as the determining factor in deciding whether the special exception use should be granted. *See, e.g.,* Cantelli v. Town Bd. of Oyster Bay, 28 Misc. 2d 126, 219 N.Y.S.2d 506, 507 (1960).

All of the other cases cited by the contract purchasers are inapposite. They compare a special exception use to another special exception use, not to a permitted use. *See, e.g.,* Phillips Petroleum Co. v. Zoning Bd. of Appeals of Bangor, 260 A.2d 434, 435-36 (Me. 1970).

development of [a] jurisdiction . . . which will . . . promote . . . [the] general welfare." Md. Code (1957, 1978 Repl. Vol.), Art. 66B, § 3.06. Zoning is one of the important elements of land planning that is used to further this purpose. *Board of County Comm'rs of Cecil County v. Gaster,* 285 Md. 233, 246, 401 A.2d 666, 672 (1979). The various purposes of zoning regulations, made in accordance with the plan, are:

> "[T]o control congestion in the streets; to secure the public safety; to promote health, and the general welfare; to provide adequate light and air; to promote the conservation of natural resources; to prevent environmental pollution, to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, recreation, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its suitability for particular uses, and with a view to conserving the value of buildings and encouraging the orderly development and the most appropriate use of land throughout the jurisdiction." Art. 66B, § 4.03.

Zoning provides a tool by which to establish general areas or districts devoted to selected uses. *Ellicott v. Mayor of Baltimore,* 180 Md. 176, 181, 23 A.2d 649, 651 (1942). Indeed, the very essence of zoning is the territorial division of land into use districts according to the character of the land and buildings, the suitability of land and buildings for particular uses, and uniformity of use. *Harbor Island Marina, Inc. v. Board of County Comm'rs of Calvert County,* 286 Md. 303, 312, 407 A.2d 738, 743 (1979); *Heath v. Mayor of Baltimore,* 187 Md. 296, 305, 49 A.2d 799, 804 (1946). *See County Comm'rs of Anne Arundel County v. Ward,* 186 Md. 330, 338-39, 46 A.2d 684, 687-88 (1946).

Generally, when a use district is established, the zoning regulations prescribe that certain uses are permitted as of right (permitted use), while other uses are permitted only under certain conditions (conditional or special exception

use).[6] In determining which uses should be designated as permitted or conditional in a given use district, a legislative body considers the variety of possible uses available, examines the impact of the uses upon the various purposes of the zoning ordinance, determines which uses are compatible with each other and can share reciprocal benefits, and decides which uses will provide for coordinated, adjusted, and harmonious development of the district. D. Hagman, *Urban Planning and Land Development Control Law* 105 (1971). *See* Art. 66B, § 4.03.

Because the legislative body, in reaching its determination, is engaged in a balancing process, certain uses may be designated as permitted although they may not foster all of the purposes of the zoning regulations and, indeed, may have an adverse effect with respect to some of these purposes. Thus, when the legislative body determines that the beneficial purposes that certain uses serve outweigh their possible adverse effect, such uses are designated as permitted uses and may be developed even though a particular permitted use at the particular location proposed would have an adverse effect above and beyond that ordinarily associated with such uses. For example, churches and schools generally are designated as permitted uses. Such uses may be developed, although at the particular location proposed they may have an adverse effect on a factor such as traffic, because the moral and educational purposes served are deemed to outweigh this particular adverse effect.

When the legislative body determines that other uses are compatible with the permitted uses in a use district, but that the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses. *See City of*

---

6. Art. 66B, § 1.00 provides in pertinent part:

" 'Special exception' [conditional use] means a grant of a specific use that would not be appropriate generally or without restriction and shall be based upon a finding that certain conditions governing special exceptions as detailed in the zoning ordinance exist, that the use conforms to the plan and is compatible with the existing neighborhood."

*Takoma Park v. County Bd. of Appeals for Montgomery County,* 259 Md. 619, 621, 270 A.2d 772, 773 (1970); *Creswell v. Baltimore Aviation Servs., Inc.,* 257 Md. 712, 719, 264 A.2d 838, 842 (1970); Art. 66B, § 1.00. Such uses cannot be developed if at the particular location proposed they have an adverse effect above and beyond that ordinarily associated with such uses. For example, funeral establishments generally are designated as special exception uses. Such uses may not be developed if at the particular location proposed they have an adverse effect upon a factor such as traffic because the legislative body has determined that the beneficial purposes that such establishments serve do not necessarily outweigh their possible adverse effects.

More particularly, by definition, a permitted use may be developed even though it has an adverse effect upon traffic in the particular location proposed. By definition, a requested special exception use producing the same adverse effect at the same location must be denied. Thus, by definition, a church may be developed even if the volume of traffic that it generates causes congestion and unsafe conditions at the particular location proposed. By definition, however, a special exception use for a funeral establishment producing the same volume of traffic and, therefore, the same congestion and unsafe conditions at the particular location proposed must be denied. It is precisely because a permitted use may be developed even though it may have an adverse effect on traffic at the particular location proposed, whereas a special exception use may not, that to grant a requested special exception use on the ground that it generates traffic volume no greater than that generated by a permitted use is logically inconsistent and in conflict with previously established standards. Accordingly, the standard articulated in *Gowl* is inappropriate. We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently asso-

ciated with such a special exception use irrespective of its location within the zone. *Turner,* 270 Md. at 54-55, 310 A.2d at 550-51; *Deen,* 240 Md. at 330-31, 214 A.2d at 153; *Anderson,* 23 Md. App. at 617-18, 624-25, 329 A.2d at 720, 724.

Here the purposes of the Carroll County Zoning Ordinance are "to promote the health, safety, morals, and the general welfare of the community, by regulating . . . the location and use of buildings . . . to provide for adequate light and air; to prevent congestion and undue crowding of the land; to secure safety from fire, panic, and other danger; and to conserve the value of property." Carroll County Zoning Ordinance § 1.0. The local legislative body, the County Commissioners of Carroll County, after engaging in a balancing process, designated single-family dwellings, churches, schools, colleges, and community buildings such as libraries, cultural and civic centers as permitted uses in a R-20,000 Residence District. Carroll County Zoning Ordinance § 7.1. As a result of this designation, such uses can be developed even if they have an adverse effect on traffic. The Commissioners also designated certain other uses of land, including funeral establishments, as special exception uses in a R-20,000 Residence District. Carroll County Zoning Ordinance § 7.2. As a result of this designation, funeral establishments cannot be developed at a particular location if they have an adverse effect on traffic above and beyond that ordinarily associated with funeral establishments irrespective of location within the zone. Carroll County Zoning Ordinance § 17.6.

Here the Board determined that the grant of the requested special exception use for the proposed funeral establishment would result in dangerous traffic conditions at the proposed location and, therefore, that the special exception should be denied. However, the record here shows that the evidence primarily relied upon by the Board was based on questionable assumptions. On appeal, the trial court did not decide whether a reasoning mind could reasonably have concluded, as did the Board, that the granting of the requested special exception use would result in dangerous

traffic conditions. Rather, the trial court erroneously decided only that there had been a denial of due process and reversed and remanded the matter to the Board for a new hearing. The trial court specifically refused to determine whether, on remand, the *Gowl* standard was applicable.

The Court of Special Appeals did not decide whether the question of adverse effect on traffic was fairly debatable. Rather, it erroneously decided only that the trial court's order remanding the case to the Board was not a final judgment. It dismissed the appeal, without indicating whether the *Gowl* standard was applicable.

In our view, under all of these circumstances, the purposes of justice will be advanced by permitting further proceedings in this case through the introduction of additional evidence before the Board and the application of the appropriate standard set forth in this opinion. Accordingly, we shall remand the case to the Board without affirmance or reversal for further proceedings in accordance with this opinion. Md. Rule 871.

> *Judgment of the Court of Special Appeals vacated.*
>
> *Case remanded to that court with directions to vacate the judgment of the Circuit Court for Carroll County and to remand the case to that court with directions to vacate the order of the Carroll County Board of Zoning Appeals and to remand the case to that Board for further proceedings in accordance with this opinion.*
>
> *Costs to be paid equally by the parties.*

*Smith, J., concurring in part and dissenting in part:*

I concur in the determination that the order of the Circuit Court for Carroll County was an appealable final order and

that the applicant was not denied due process of law. I dissent, however, from Part III of the opinion dealing with the cross petition.

I

I do not think there was sufficient evidence before the Board of Zoning Appeals for Carroll County to warrant denial of the special exception here.

The Board of Appeals stated as its reason for denying the application:

> While the requirements of the Maryland State Highway Administration, Bureau of Engineering Access Permits could be met, expert testimony presented in opposition to the request emphasized that the characteristics of the vehicular traffic that would be generated by the funeral home, or funeral processions in particular, would result in dangerous conditions for both north and south bound traffic, as well as vehicles in such processions, because of sight distance problems resulting from the curve near the north end of the property and the hump, or vertical curve located past the southerly end of the property. Therefore, the Board finds the request to establish the funeral home as a Conditional Use must be denied.

The expert's letter to the board, upon which letter the decision was based, said, "A funeral procession requires the stopping of traffic on Washington Road for approximately five minutes or 1/12th of an hour." It obviously is this to which the majority opinion refers when it states of the expert, "He pointed out that the contract purchasers had 'indicated that typically a procession takes 5 minutes to exit from the site.'" Pritts, the contract purchaser, said:

> Well, the average I would say would probably be 12 or 15 cars and sometimes we have six cars,

sometimes fewer, but I would say *15 cars would probably be the average.*

\* \* \*

I don't believe it would take (if we had 30 cars, even 30 cars going) I don't see where it would take over five minutes, at the *most* . . . . [(Emphasis added.)]

It can plainly be seen that the five minute estimate was *not* the *average* nor was it *typical.* There was no other evidence before the board on this subject. Not only did the expert upon whom the board relied make his calculation on the basis of a figure other than the average number of cars at a funeral testified to by Mr. Pritts, but he also failed to take into consideration the traffic which might be generated by a permitted use in the area in question.

We have said repeatedly, frequently in a zoning context, that an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant. *See, e.g., County Council v. District Land,* 274 Md. 691, 704, 337 A.2d 712 (1975); *A. H. Smith Sand & Gravel v. Dep't,* 270 Md. 652, 667, 313 A.2d 820 (1974); *Surkovich v. Doub,* 258 Md. 263, 272, 265 A.2d 447 (1970); *Creswell v. Baltimore Aviation,* 257 Md. 712, 721, 264 A.2d 838 (1970); *Westview Park v. Hayes,* 256 Md. 575, 581, 261 A.2d 164 (1970); *Hunter v. County Commissioners,* 252 Md. 305, 310, 250 A.2d 81 (1969); *Smith v. Co. Comm'rs of Howard Co.,* 252 Md. 280, 284, 249 A.2d 708 (1969); *Dill v. The Jobar Corporation,* 242 Md. 16, 23, 217 A.2d 564 (1966); and *Miller v. Abrahams,* 239 Md. 263, 273, 211 A.2d 309 (1965).

The permissible basis for denial of a petition for a special exception was articulated for the Court by Chief Judge Hammond in *Rockville Fuel v. Bd. of Appeals,* 257 Md. 183, 262 A.2d 499 (1970):

If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide.

> But, if there is no probative evidence at all of harm
> or disturbance in light of the nature of the zone
> involved or of factors causing disharmony to the
> operation of the comprehensive plan, a denial of an
> application for a special exception is arbitrary,
> capricious and illegal. [Montgomery Co. v.]
> *Merlands [Club,* 202 Md. 279, 96 A.2d 261 (1953)].
> [*Id.* at 191.]

A more recent case in which we reversed the denial of a
special exception by a local board and an affirmance of that
denial by the circuit court is *Turner v. Hammond,* 270 Md.
41, 310 A.2d 543 (1973). Judge McWilliams concluded his
opinion for the Court there by stating:

> We have said that substantial evidence is
> required to support the findings of the Board and
> that substantial evidence is more than a scintilla of
> evidence. *Prince George's County v. Meininger,* 264
> Md. 148, 152, 285 A.2d 649 (1972), and *Kirkman v.
> Montgomery County Council,* 251 Md. 273, 277-78,
> 247 A.2d 255 (1968). All definitions of scintilla, at
> least in this context, are imprecise but if we assume
> it takes ten gossamers to make a scintilla then the
> appellees' evidence before the Board falls well short
> of five gossamers. [*Id.* at 60.]

In my view the evidence of the protestants here "falls well
short of five gossamers." Thus, the special exception should
have been granted.

## II

I believe the test articulated in *Gowl v. Atlantic Richfield
Co.,* 27 Md. App. 410, 341 A.2d 832 (1975), is a proper one
to be applied in determining whether a special exception
should be granted. I believe it consistent with *Turner,* 270
Md. 41, and *Rockville,* 257 Md. 183, and not inconsistent
with other of our decisions. I recognize that, as the majority
opinion asserts, no court of last resort appears to have

applied that standard. That does not make it wrong, however. By the same token, *no court of last resort seems to have rejected the* Gowl *standard.* Moreover, Chief Judge James Macgill of the Fifth Judicial Circuit of Maryland, whose reasoning was adopted by the Court of Special Appeals in *Gowl,* was regarded by such people as Chief Judge Hall Hammond of this Court in my early day on the Court as one of the outstanding authorities in Maryland on zoning. At the time of the decision in the trial court in *Gowl* Judge Macgill had already been a Maryland circuit judge for more than nineteen years and he was a zoning examiner in Howard County for several years prior to that.

It is recognized by the majority opinion, "that 3 R. Anderson, *American Law of Zoning* § 19.14, p. 407 (2d ed. 1977) and 3 A. Rathkopf, *The Law of Zoning and Planning* § 41.10, p. 41-61 (4th ed. 1980), cited by the contract purchasers articulate a standard approximating that articulated in *Gowl.*" What Anderson says is, "The effect of a proposed use on its neighbors will not support a denial of a special permit unless the effect is greater than that of uses permitted in the district without special permit." *Id.* at 407. Citing *Turner,* 270 Md. 41, Rathkopf states, "The board must also consider uses to which the property could be put without a special exception, and the extent to which they would measure up to the criteria imposed," *Id.* at 41-61. These authorities reinforce my point of view. After all, these gentlemen are recognized in the field. There is such a thing as the law of common sense.

We all agree that the board of appeals may not arbitrarily and capriciously deny a request for a special exception. The problem is against what do we measure traffic in determining that it will have an adverse effect and produce a hazard warranting rejection of an application? Surely there must be some standard. It seems to me logically that since the legislative body has determined that in the district in question "[p]rincipal permitted uses" include "[c]hurches, schools and colleges," and "[b]uildings and properties of a cultural, civic, educational, social or community service-type such as libraries, ponds[,] . . . playgrounds [and]

community centers," that it follows that in determining whether or not the board has been arbitrary one should measure the traffic to be generated by the proposed special exception against that generated by permitted uses. Why is it not arbitrary and capricious to deny permission for this funeral home on the basis of the traffic hazard when a church or certain others of the permitted uses may generate as much or more traffic?

Members of some religious demoninations, *e.g.,* the Protestant Episcopal Church, regularly have their funeral services from their church sancutuary. Thus, a church could be erected here which in the case of a funeral would generate exactly the same amount of traffic this funeral home would generate, but the church is a permitted use. Moreover, it is conceivable that after attendance at Sunday morning worship services, weddings, or other events on the church calendar the traffic which might pour out of its parking lot would be substantially in excess of that from the funeral home.

A playground is a permitted use. In my part of the State the traffic which would be generated by just an average Little League baseball game would dwarf that which is suggested as the average for a funeral in this instance. A hotly contested game between two bitter rivals obviously would produce even greater traffic.

A college is a permitted use. What amount of traffic might be expected to spew out of a parking lot adjacent to a college athletic field after a major football game?

To hold to the *Gowl* rule would not mean that every application for a special exception for a funeral home would have to be granted simply because the application is made. There can be a difference in funeral homes. All are not the same, by any means. Counsel for Pritts was asked at oral argument if he could articulate circumstances warranting denial by virtue of a demonstrable adverse effect upon surrounding property. In pointing out that all funeral homes are not the same he said:

> If a funeral home is one that does contract embalming work, for example, and has a lot of traffic in and out and has a laboratory facility, that is entirely different from the normal funeral home. If a funeral home is in the business of selling caskets to a lot of other funeral homes in the area, that is something larger than the normal funeral home. If a funeral home is in the business of selling grave markers or funeral paraphernalia, then I think in that circumstance you have something different than the normal funeral home.

I have known even in a town smaller than Westminster of a very busy funeral home that sometimes had as many as three funerals in one day. No such proposition was involved here.

When, as here, the special exception is denied on the basis that operation under the granted exception would create a traffic hazard and an identical or worse traffic hazard could arise from permitted uses, I must regard the action as arbitrary and capricious, such that should not be tolerated in a free land.

### III

In my view whether one proceeds upon the reasoning set forth in I or that in II we should direct that the case be remanded to the Board for the granting of the application for special exception upon such conditions and safeguards as the Board may find appropriate under the ordinance and the evidence.