483 A.2d 786

The GOTACH CENTER FOR HEALTH

v.

The BOARD OF COUNTY COMMISSIONERS OF
FREDERICK COUNTY.

No. 170, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Nov. 15, 1984.

Lawrence E. Finegan, Frederick, with whom were Rosenstock, Burgee & Welty, P.A., Frederick, on brief, for appellant.

Joseph E. Emerson, Asst. County Atty., for Frederick County, for appellee.

Argued before WILNER, BISHOP, and ADKINS, JJ.

WILNER, Judge.

The Gotach Center for Health, through its founder, Dr. Nicola M. Tauraso, applied to the Frederick County Board of Appeals for a special exception in order to operate a private school. The property in question is a fourteen-acre tract currently zoned R–3 (Residential). The board denied the application; on appeal, the Circuit Court for Frederick County affirmed. Hence, this appeal.

Until 1980, Dr. Tauraso conducted his pediatric practice from the property. In that year, he gave up his practice and began to devote himself to the teaching and propagation of holistic medicine. The private school that he proposed would have four components: (1) an adult education program for health professionals to operate year round, (2)

a children's school, to operate chiefly in the summer and perhaps one week at Christmastime, (3) "an administrative base for our national seminar and home study programs, which is essentially what we are using the property for now," and (4) a "spiritual studies and retreat center."

Dr. Tauraso's intent, we are told, is that the two educational programs, together, would not have more than fifty students at any one time, although the record, in some instances, suggests that the fifty-student maximum applies only to the adult program. The children's program would extend for one to two weeks; the parents would bring the children to the center on a Sunday, leave them, and retrieve them on a Friday. The adult program, also residential, would be a three-week program. Dr. Tauraso expected to have between twenty and twenty-five employees working on the property.

The Gotach property is surrounded on three sides by the Cloverhill subdivision, a community of single-family residences. The community organization and many of the individual residents opposed the application on the principal grounds of noise, depletion of their well-water supply, traffic safety, and commercialization. Those were the issues before the Board of Appeals.

Gotach produced four witnesses on its behalf. Dr. Tauraso described the four programs he expected to operate. He stated that there would be no more than fifty students at a time, and that they would not be allowed to leave the property during the one-, two-, or three-week period of their respective courses. Upon those assumptions, Edward Smariga and John Laughland, civil engineers, testified that the road system was adequate to support the proposed use. That conclusion was based, at least in part, on the premise that there would be less traffic from that use than was generated from Dr. Tauraso's former pediatric practice or that would be generated by other permitted uses in an R–3

zone. Frank Rothenhoefer, also a civil engineer, testified that the well on the property was adequate for the proposed use and that less water would be used for that use than for other uses permitted in the R-3 zone. He and Smariga opined that the private school envisioned by Dr. Tauraso would be in harmony with the county's comprehensive development plan and would not adversely affect the near-by community.

A number of residents from the Cloverhill development came to quite different conclusions. Unlike Gotach's experts, they did not seek to compare the proposed use with other uses to which the property might be put, but expressed their concern over the effect that the proposed use itself would have on traffic safety, the adequacy of their well-water supply, and the residential character of the neighborhood. A particular concern expressed by a number of the protestants, including one who was a State Trooper, was over the hazardous nature of Poole Jones Road, which is the access road to the community and the Tauraso property. The board members personally inspected the site, including the adjacent roads.

A private school is a permitted use in an R-3 zone by special exception. The procedural and substantive standards for considering and granting special exceptions are set forth in § 1-19-48 of the Frederick County zoning law. In relevant part, that section states:

"(b) A grant of special exception is basically a matter of development policy, rather than an appeal based on administrative error or on hardship in a particular case. The board of appeals should consider the relation of the proposed use to the existing and future development patterns. A special exception shall be granted when the board finds that,

(1) The proposed use is in harmony with the purpose and intent of the comprehensive development plan and of this chapter; and

(2) The nature and intensity of the operations involved in or conducted in connection with it and the size of the site in relation to it are such that the proposed use will be in harmony with the appropriate and orderly development of the neighborhood in which it is located; and

(3) Operations in connection with any special exception use will not be more objectionable to the nearby properties by reason of noise, fumes, vibration, or other characteristics, than would be the operations of any permitted use not requiring special exception approval; and

(4) Parking areas will comply with the off street parking regulations of this chapter and will be screened from adjoining residential uses, and the entrance and exit drives shall be laid out so as to achieve maximum safety.

(5) The road system providing access to the proposed use is adequate to serve the site for the intended use."

After considering the evidence presented at the public hearing and the impressions gained from its own inspection, the board found:

"1.  That the proposed use of the property as a private school is not in harmony with the purpose and intent of the Comprehensive Development Plan and of the Zoning Ordinance in the fact that the subject area is an existing developed area of single family residential homes and in order to be in harmony with the purpose and intent of the Comprehensive Development Plan the development of residential single family dwellings would be appropriate.

2.  That the nature and intensity of the operation of the property for a private school in conjunction with the size of the property and most particularly with its location to the streets that give access to the property would not be in harmony with the appropriate and orderly development of the neighborhood in which it is located in the fact that the Board, after a reinspection of the property for a second time, found that the si[ght] distance at the intersection of Runnymeade

Drive and Poole Jones Road to the west is extremely poor due to the steepness of the road going in the westerly direction and is also extremely poor in the easterly direction due to the fact that there is almost a 90 degree bend in Poole Jones Road as it heads towards Opossumtown Pike.

3. The Board further finds that the special exception would be more objectionable to nearby properties by reasons of noise generated by occupants of the private school, in that the facilities that the occupants would be utilizing are not screened from the adjacent residential properties.

4. The Board further finds that the proposed use of the property as a private school could create a potential inadequate water supply that would adversely affect all the residents of Cloverhill Subdivision.

5. The Board feels that the use as outlined by the Applicant seems to be commercial and would be encroaching on the residential character of the neighborhood. This fact is supported by testimony from the Applicant when he stated that his monthly postage bill for mailing out pamphlets, books and other printed material is approximately $20,000 a month and that the administrative offices for the Gotach Center and for the national foundation of holistic medicine would be operated from the subject property."

The circuit court found that there was substantial evidence before the board to support those findings, and on that basis affirmed. Gotach now asks us:

"I. Did the Board of Appeals fail to apply the proper legal standard in considering the impact of Appellant's proposed special exception on adjoining properties?

II. Was the decision of the Board of Appeals, denying Appellant's request for a special exception to operate a

private school, unsupported by the evidence and as a result, arbitrary, capricious and illegal?"

The first issue raised by Gotach is based on the supposition that, in considering the application, the board improperly applied the standard enunciated by the Court of Appeals in *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), rather than that set forth in the county zoning ordinance (§ 1–19–48, *supra* ), which, it argues, follows the test stated by this Court in *Gowl v. Atlantic Richfield Co.*, 27 Md.App. 410, 341 A.2d 832 (1975).

In *Gowl*, the county zoning board had denied a special exception on a number of grounds, one of which was its conclusion that the proposed use would adversely affect the surrounding property by creating undue traffic congestion on a presently inadequate and hazardous road network. In reviewing that determination, we said, at 417–18, 341 A.2d 832 that "[w]here ... the potential volume of traffic under the requested use would appear to be no greater than that which would arise from permitted uses, we believe it arbitrary, capricious and illegal to deny the application for special exception on vehicular traffic grounds." The comparison, then, under *Gowl*, as to traffic, was whether the proposed use would create conditions worse than any use permitted without special exception. That, for the most part, was the analysis used by Messrs. Smariga, Laughland, and Rothenhoefer on behalf of Gotach as to traffic, water usage, and general compatability.

In *Schultz v. Pritts*, the Court of Appeals, proceeding upon a different analysis, concluded that, ordinarily, the test stated in *Gowl* was not the proper one to use in considering special exceptions. It held, in relevant part, [291 Md.] at 20–23, 432 A.2d 1319:

"Generally, when a use district is established, the zoning regulations prescribe that certain uses are permitted as of right (permitted use), while other uses are permitted

only under certain conditions (conditional or special exception use). In determining which uses should be designated as permitted or conditional in a given use district, a legislative body considers the variety of possible uses available, examines the impact of the uses upon the various purposes of the zoning ordinance, determines which uses are compatible with each other and can share reciprocal benefits, and decides which uses will provide for coordinated, adjusted, and harmonious development of the district....

Because the legislative body, in reaching its determination, is engaged in a balancing process, certain uses may be designated as permitted although they may not foster all of the purposes of the zoning regulations and, indeed, may have an adverse effect with respect to some of these purposes. Thus, when the legislative body determines that the beneficial purposes that certain uses serve outweigh their possible adverse effect, such uses are designated as permitted uses and may be developed even though a particular permitted use at the particular location proposed would have an adverse effect above and beyond that ordinarily associated with such uses....

When the legislative body determines that other uses are compatible with the permitted uses in a use district, but that the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses.

\* \* \* \* \* \*

*We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its*

*location within the zone."* (Footnote omitted; emphasis added.)

In summary, the distinction between the *Gowl* and *Schultz* tests is this: under *Gowl*, the focus is on whether, with respect to a given factor stated in the ordinance, the proposed conditional use would affect the neighborhood more adversely than any of the uses permitted without special exception. Under *Schultz*, the possible effects of permitted uses are not considered; the focus, rather, is on whether, with respect to that factor, the proposed conditional use would have a more adverse effect on the particular location at issue than it would have generally in the zone. *Schultz* is a more particularized, and normally a more stringent, test for an applicant to meet than is *Gowl*.

The underpinning of the *Schultz* analysis is the legislative discretion necessarily involved in the "balancing process." We do not read that case as binding county legislative bodies to the particular analysis used there. All that *Schultz* seems to say is that, absent some clear legislative direction to the contrary, if a particular kind of impact is required to be taken into account in considering a special exception, the impact is to be measured by the test enunciated in *Schultz* and not by that stated in *Gowl*. We see no reason, however, why a county legislative body cannot adopt a *Gowl*-type standard in the ordinance itself, if it chooses to do so. There is nothing inherently improper about comparing the effect of a particular conditional use with that of a permitted use; it simply is not the kind of comparison normally regarded as consistent with general legislative intent.

It is in that light that we consider § 1–19–48 and the conclusions of the Board of Appeals.

Section 1–19–48(b) sets forth five factors to be considered in deciding whether to grant a special exception. All five factors must be resolved favorably to the applicant to warrant approval; a negative conclusion on any one, if

supported by substantial evidence, will suffice to justify denial.

Conditions (b)(1), (2), (4), and (5) indicate no legislative predilection for a *Gowl*-type comparison, and so, as to them, the *Schultz* test is the relevant standard. The focus, then, as to those factors, is whether the proposed private school would have an adverse effect on that location greater than the effect it would have generally within an R–3 zone. In our judgment, the evidence as to condition (b)(5) clearly was sufficient to justify the board's action. We therefore need not consider its findings as to the other conditions.[1]

The evidence showed that the principal access road to the community was narrow and hazardous. Within a few hundred feet from the Gotach property was a particularly dangerous curve. The traffic generated by the private school—the employees coming and going, the students (or their parents) arriving and leaving, the delivery trucks required to bring food and other supplies to the facility in order to support even a fifty-student residential program—all could reasonably be regarded as having a greater adverse impact on the road system in that area than would be the case generally in an R–3 zone. As noted, the board had before it not only the testimony of the area residents on that issue but its own observations as well. The contrary expert testimony produced by Gotach, geared as it was to a *Gowl*-type analysis, could properly be discounted by the board.

For that reason, we believe that the court properly affirmed the board's decision.

JUDGMENT AFFIRMED: APPELLANT TO PAY THE COSTS.

---

**1.** Condition (b)(3), quoted above, seems to be expressed in terms of a *Gowl* analysis. For the reasons noted, we see nothing improper in the county's adoption of that standard in the ordinance.